(78 Misc. Rep. 7.)

PEOPLE ex rel. SHANE v. GITTENS, Justice of the Peace.

(Supreme Court, Special Term, Nassau County. October, 1912.)

*(Syllabus by the Court.)*

GAMING (§ 87*)—CRIMINAL RESPONSIBILITY—"BOOK-MAKING."

. An information insufficiently charges the commission of the crime of book-making "with or without writing," under section 986 of the Penal Law (Consol. Laws 1909, c. 40), as amended by Laws 1910, c. 488, which in substance alleges that the defendant unlawfully, willfully, and privately made several bets orally and without writing, but that a memorandum of each of the bets was prepared by the opposite party thereto and shown the defendant. Such an information fails to set forth the chief elements of the crime of "book-making," as defined by the courts, in that, among other things, it fails to charge the defendant with the public quoting and offering of odds, with the soliciting of bets, with inducing the public to take chances with him in any scheme of odds, and with effecting through his methods any passing of money or property.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 235–240; Dec. Dig. § 87.*]

Application by Paul Shane to be released from the custody of Charles F. Gittens, Justice of the Peace of the Town of Hempstead, Nassau County, sitting as committing magistrate. Relator discharged from custody.

John J. Graham, of New York City, for relator.

Charles T. McCarthy, of Glen Cove, Asst. Dist. Atty., for the People.

Samuel Marcus, of New York City, for Society for Prevention of Crime.

SCUDDER, J. This matter comes before the court on an application by the above-named relator to be released from the custody of the above-named respondent, on a criminal charge pending against relator charging him with committing the crime of "book-making in violation of section 986 of the Penal Law of the state of New York."

The information under which the relator is held charges that one Paul Shane did commit the crime of book-making, in violation of section 986 of the Penal Law of the state of New York, in manner following to wit:

"On the 6th day of June, 1912, at Belmont Park, in the town of Hempstead, Nassau county, N. Y., on the grounds of a private inclosure, known as the grounds and race course of the Belmont Park Racing Association, a domestic corporation, owned by said corporation and by it leased on said day to the United Hunts Racing Association, a domestic corporation, where certain trials and contests of skill, speed, and endurance of horses, commonly called horse racing, were then and there conducted, of which trials and contests the said Paul Shane was then and there a spectator, having paid the fee required by the said last-mentioned corporation for admission to said grounds, the said Paul Shane while moving about on said grounds, did unlawfully, willfully, and privately make several bets or wagers on the result of each of said contests, the said bets or wagers being made by him orally and without the use of paraphernalia or writing, but a note or memorandum of each of said bets or wagers was then and there prepared and written by the opposite party to each of said bets or wagers, stating the name of the

horse upon which the particular bet or wager was made and the amount thereof, and the said note or memorandum was thereupon in each case shown to the said Paul Shane by the said opposite party at the request of the said Paul Shane, against the form of the statute in such case made and provided."

The deposition supporting the information reads as follows:

"State of New York, Nassau County—ss.:

"Michael Williams, the above-named informant, being duly sworn and examined in relation to the foregoing information, deposes and says:

"I reside in the village of Hempstead, Nassau county, N. Y., and am one of the official deputy sheriffs of Nassau county. I was present on June 6, 1912, at the race meet conducted by the United Hunts Racing Association on the grounds of the Belmont Park Racing Association at Belmont Park in the town of Hempstead, Nassau county, New York. I saw the above-named Paul Shane there. He paid the fixed fee of $3.00 to enter the grounds on said day as a spectator of the horse races and trials of speed of horses then and there being conducted. There were six races on said day, and during the progress of the day, and while these races were going on, the said Paul Shane was walking around the grounds, and at that time I saw him make bets and wagers with various persons on the result of each and every horse race then and there run. He made the bets orally with these persons at the time, but, when the bets and wagers were made, the other party to the bet or wager made a note and memorandum of the same in writing, which note or memorandum set forth the name of the horse or animal then and there bet upon, together with the amount of the particular bet and wager, which memorandum or note was then and there shown by the said opposite party to each of said bets and wagers to the said Paul Shane, at his, the said Paul Shane's, request. The public were admitted to the above grounds on payment of a fixed admission fee.                          Michael Williams.

"Sworn to before me June 6, 1912.

"Charles F. Gittens,
"Justice of the Peace, Town of Hempstead."

Section 986 of the Penal Law, under which relator is held, provides:

"Sec. 986. Pool-selling, book-making, bets and wagers.—Any person who engages in pool-selling, or book-making with or without writing at any time or place; or any person who keeps or occupies any room, shed, tenement, tent, booth, or building, float or vessel or any part thereof, or who occupies any place or stand of any kind, upon any public or private grounds, within this state, with books, papers, apparatus or paraphernalia, for the purpose of recording or registering bets or wagers, or of selling pools, and any person who records or registers bets or wagers, or sells pools or makes books, with or without writing, upon the result of any trial or contest of skill, speed or power of endurance, of man or beast, or upon the result of any political nomination, appointment or election; or upon the result of any lot, chance, casualty, unknown or contingent event whatsoever; or any person who receives, registers, records or forwards, or purports or pretends to receive, register, record or forward, in any manner whatsoever, any money, thing or consideration of value, bet or wagered, or offered for the purpose of being bet or wagered, by or for any other person, or sells pools, upon any such result; or any person who, being the owner, lessee or occupant of any room, shed, tenement, tent, booth or building, float or vessel, or part thereof, or of any grounds within this state, knowingly permits the same to be used or occupied for any of these purposes, or therein keeps, exhibits or employs any device or apparatus for the purpose of recording or registering such bets or wagers, or the selling of such pools, or becomes the custodian or depositary for gain, hire or reward, of any money, property or thing of value, staked, wagered or pledged, or to be wagered or pledged upon any such result; or any person who aids, assists or abets in any manner in any of the said acts, which are hereby forbidden, is guilty of a misdemeanor, and upon conviction is pun-

ishable by imprisonment in a penitentiary or county jail for a period of not more than one year."

Prior to 1910 the words "with or without writing" did not appear in section 986 of the Penal Law. These words were read into that section by chapter 488 of the Laws of 1910. Before the enactment of this statute, under the decision of the Court of Appeals in People ex rel. Lichtenstein v. Langan, 196 N. Y. 260, 89 N. E. 921, 25 L. R. A. (N. S.) 479, 17 Ann. Cas. 1081, the facts stated in the information before me would not have constituted the crime of book-making. The question to be decided here is whether the acts alleged in the information are sufficient to constitute the crime of book-making under the amendment of 1910 to said section 986.

The Constitution of the state forbids book-making, but does not define what book-making is, and the statute we have quoted forbids engaging in book-making, also without defining it, but makes it a distinct and independent offense. Book-making has been defined in People ex rel. Lichtenstein v. Langan, 196 N. Y. 260, 264, 89 N. E. 921, 922, 25 L. R. A. (N. S.) 479, 17 Ann. Cas. 1081. Judge Haight, writing for the court and discussing the contention of the district attorney that the laying of odds and orally announcing them constituted book-making within the meaning of the statutes, said:

"The term 'book-making' originally indicated a collection of sheets of paper or other substances upon which entries could be made, either written or printed. But the term has been used in many ways, and in determining its meaning as used in this statute we must consider the evident purpose and intention of the Legislature in enacting the provision in question, giving to the term its ordinary and accepted meaning as it was understood at that time."

The court then goes on to say (196 N. Y. 265, 89 N. E. 922, 25 L. R. A. [N. S.] 479, 17 Ann. Cas. 1081):

"The ordinary book-maker is a person who follows the races and becomes fully informed with reference to the skill, speed, and endurance of the horses that are entered for races. These horses are taken from one meeting to another of the various racing associations, and thereby the book-makers are enabled to prepare a list of the horses entered for a race, with the odds so arranged as to percentages as to give them a profit whichever the winning horse may be."

The information in that case charged the defendant Langan with "unlawfully, willfully, and knowingly to many persons, upon the results of said races and upon various and divers horses that were announced to participate and did participate in said races, quote and lay odds; that is to say, did state and publish to many persons the terms on which they * * * were willing then and there to bet with said persons on said results and against said horses, and did then and there quote and lay odds as aforesaid, * * *" reciting the bets made. The court held this information failed to allege acts which constituted the crime of book-making. This decision was rendered prior to 1910, and before the words "with or without writing" were read into section 986 of the Penal Law by chapter 488 of the Laws of 1910.

Do these words, "with or without writing," so change the law forbidding book-making as to constitute a crime of the acts with the commission of which relator is charged, acts which, prior to 1910, did not constitute the crime of book-making under the decision of the Court of Appeals in the case of People ex rel. Lichtenstein v. Langan, or do these acts constitute betting only, which has never been made a crime in this state, excepting betting upon the result of a prize fight which is a misdemeanor (Penal Law, § 1712)? Doubtless the Legislature, by the enactments we are considering, intended to suppress public gambling on race tracks and elsewhere, and to prevent the injury to public morals resulting therefrom. But, as said by Judge Vann in the Lichtenstein Case:

"Private betting and book-making are widely separated, both in nature and effect, and the evil, if any, resulting from the one is trifling, while the evil resulting from the other is serious."

Book-making the Legislature has sought to suppress by making it a crime to engage in it. Betting the Legislature has declared unlawful, but has not made it a crime, except betting on prize fights. Engaging in book-making is betting, but ordinary betting on a horse race is not book-making and is not a crime, and when the sum or sums won or lost by betting within the space of 24 hours aggregate less than $25 it is not punishable; if in excess of this amount, betting is punishable by a fine in an amount of not less than five times the sum so lost or won, to be recovered in a civil action by the overseer of the poor. See Penal Law, §§ 989, 990, 991.

It does not seem probable that, had the Legislature intended to make several bets, such as those with the making of which the relator is charged, punishable by imprisonment for a possible term of one year, it would have declared at the same time that the making of a single bet or several bets exceeding $25 in amount was punishable by a fine only in a civil action brought by the overseer of the poor. As said by Chief Judge Cullen in People v. Lambrix, 204 N. Y. at page 264, 97 N. E. at page 525, referring to section 986 of the Penal Law before its amendment in 1910:

"It was directed against public gambling and professional gamblers, and, * * * while all gambling has for a long time been illegal in this state, professional gambling and the maintenance of gambling resorts alone have been subject to the penalties of the criminal law."

The information now before the court contains no allegation that relator was a professional gambler, or that he made his bets in such a way as to constitute his betting "public gambling"; on the contrary, it alleged that relator "did * * * privately make several bets. * * *" Under section 986 of the Penal Law the person who is declared guilty of a misdemeanor is "any person who engages in * * * book-making with or without writing. * * *" Relator is charged in the present information with committing "the crime of book-making." The Court of Appeals, in People v. Bright, 203 N. Y. 73, 96 N. E. 362, commenting on the words "who engages," has said:

"The phrase 'who engages' is significant. It means something more than occasional participation. It imports some continuity of practice, just as the

137 N.Y.S.—43

epithet 'common' implies that a common gambler is a person who customarily or habitually or frequently carries on the gambling practices which are denounced by the statute. The underlying idea is the habitual participation in gambling as a money-making pursuit."

The information before me fails to allege the element of professionalism or habitualness on the part of relator. It fails to charge the relator with the public quoting and offering of odds, with the soliciting of bets, with inducing the public to take chances with him in any scheme of odds, or with effecting through his methods any exchange of money or property. As book-making has been defined by the courts, its chief elements seem to be lacking in the acts committed by the relator as set forth in the information. As said by Chief Judge Cullen, referring to section 986 of the Penal Law, in People v. Langan, supra:

"While in reality the statute is directed against gambling, not against its incidents, the law has laid hold of certain incidents on the theory that, those being prohibited, the evil itself will be suppressed, because of the impracticability of carrying on gambling on a large scale without some of the accessories denounced by the statute."

Whether this plan is the best plan is for the Legislature, not for the courts, to determine. The court is powerless to hold that a given act, or a series of acts, constitute a crime, unless they fall within the prohibition of the statute. The remedy for the evil complained of here must come from the Legislature. The Legislature has made it a crime to bet on prize fights. It can make it a crime to bet on horse races. It has not done so, and the court is powerless to do so. I hold that the Legislature, in inserting in 1910 in section 986 of the Penal Law, after the word "book-making," the words "with or without writing," did not intend to make betting a crime, but did intend to deal with that form of professional gambling known as book-making.

It was contended on the argument that, if the acts alleged in this information constitute a crime, then the directors and persons in charge of the racing association are likewise guilty of a crime, without any intent whatever to violate the law. I agree with the learned district attorney that the answer to this is that the law requires knowledge of the acts constituting the crime on the part of the persons accused, and the law will not permit the conviction of the owner of a race track, who has no knowledge of the fact that book-making (not ordinary betting) is going on upon his premises. It is erroneous to say that any director could be held liable under these conditions, under the present law. Section 973 of the Penal Law of the state of New York, as a penal statute, must be strictly construed. True, there need be no proof of actual knowledge, where a thing is clearly and expressly prohibited, for in such a case knowledge is always presumed; but here the thing prohibited is the keeping of a race track used for gambling, and no director could be convicted of keeping a race track used for gambling unless it was proven he had guilty knowledge that the place was, not once or twice, but continually, used for gambling in the form of book-making (not of private betting), and had taken no effective means to stop it.

Counsel for the Society for the Prevention of Crime in his brief asserts:

"We cannot escape the conviction that the information * * * purposely avoided setting forth all the acts of Shane," and he expresses grave doubts "whether this case is not collusive."

The recognized standing and high character of the learned district attorney of Nassau county and of the assistant district attorney refute any such insinuation. The information in the case at bar, the court is informed by the assistant district attorney, was written by the justice issuing the warrant at his dictation, and set forth all the acts that the informant, Michael Williams, a deputy sheriff of Nassau county, observed in connection with relator's betting. An information performs to some extent the same office as an indictment, and must state with accuracy, not only the crime charged, but the facts which constitute the crime so charged, as distinct from conclusions of law. I think the information here fails to allege acts which constitute the crime of book-making, the only crime with which relator is charged.

The motion should be granted, and the relator discharged from custody; and it is so ordered.